## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

WILLIAM BURKINS,

    Plaintiff,

    v.

CORIZON RESIDENT AGENT, et al.,

    Defendants.

Civil Action No.:  SAG-21-244

### MEMORANDUM OPINION

Self-represented Plaintiff William Burkins filed this civil rights action against Corizon Health Inc., RN Uzoamaka Nwabuwa, NP Clarice Aryiku, Dr. Robert P. Williams, and Mable Fletcher on January 28, 2021.  ECF No. 1.  Burkins filed an Amended Complaint, pursuant to the Court's direction, on March 2, 2021.  ECF No. 4.  Defendants filed a Motion to Dismiss or, Alternatively, for Summary Judgment on June 29, 2021, and a Supplement to the Motion on December 28, 2021.  ECF Nos. 24, 29.  In support of their dispositive motion, Defendants have provided the affidavits of Robert Williams, M.D. (ECF No. 24-4), Uzoamaka Nwabuwa, RN (ECF No. 24-9), Clarice Aryiku, NP (ECF No. 24-10), Mable Fletcher (ECF No. 24-11), and Gedion Atnafu, M.D. (ECF No. 29-1), along with Burkins's relevant medical records (ECF Nos. 24-5 – 24-8). Burkins filed a response and Defendants replied.  ECF No. 28.[1]  A hearing is not necessary. *See* Local Rule 105.6 (D. Md. 2021).  For the reasons explained below, the Court will grant Defendants' Motion.

---

[1] Burkins filed a response to Defendants' Motion on October 13, 2021.  ECF No. 27.  However, his arguments concern his diagnosis with the COVID-19 virus rather than the claims outlined in the instant complaint regarding a shoulder injury and his Hepatitis C treatment.  *See id.*  On October 25, 2021, Defendants filed a reply indicating that Burkins's response is instead a response related to another of his cases pending in this District, Civil Action No. LKG-21-629.  ECF No. 28.  It appears Burkins mistakenly filed his response in the incorrect case.  Defendants have attached the correct response that Burkins submitted in Civil Action No. LKG-21-629, which, in light of Burkins's self-represented status, the Court will consider as Burkins's opposition to Defendants' Motion.  *See* ECF No. 28-1.

**Background**

I.     **Hepatitis C Treatment**

In his Complaint as amended, Burkins asserts that he informed staff at Jessup Correctional Institution ("JCI") that he had a Hepatitis C infection ("HCV") upon his incarceration in September 2018.  ECF No. 4-1 at 2.  Inmates with HCV are enrolled in the chronic care clinic, where Burkins asserts treatment should have started immediately, but had still not been completed two and a half years later.  *Id.*  According to Burkins, he reported to medical on December 3, 2020, for a chronic care appointment with Dr. Robert Williams to follow up with his Hepatitis C treatment.  *Id.* at 1.

"HCV is an infection caused by a virus that attacks the liver and leads to inflammation;" chronic infections, caused by HCV, damage the liver resulting in fibrosis and cirrhosis.  Atnafu Decl., ECF No. 29-1 at ¶ 5.  Dr. Gedion Atnafu, a physician who serves on the Infectious Diseases Panel, explains that inmates with chronic HCV infections are enrolled in the chronic care clinic for clinical evaluation and laboratory testing to determine liver function.  *Id.* at ¶ 8.  A chronic care provider refers inmates with HCV to the Infection Disease Panel ("the Panel"), which reviews cases and discusses options for direct-acting antiviral ("DAA") medications used to treat HCV. *Id.*  The Panel recommends further evaluation or DAA treatment.  *Id.*

Burkins was seen for a chronic care visit on April 24, 2019, at which time Dr. Mofikapara Wright recommended a "Hep C work up," and ordered genotype and viral load testing.  Medical Records, ECF No. 24-5 at 91-93.  It was noted during a sick call that a fibroscan, which measures the degree of fibrosis or scarring on the liver, should be considered if Burkins had a detectable viral count.  Medical Records, ECF No. 24-6 at 5; ECF No. 29-1 at ¶ 6.  A fibroscan was ordered on May 20, 2019, by NP Motunrayo Adegorusi, who noted that labs had been completed and Burkins had consented to treatment.  ECF No. 24-6 at 21.  The fibroscan was completed on May

24, 2019, showing fibrosis at F0-F1 levels, meaning Burkins had either no liver scarring or mild liver scarring. *Id.* at 34-35.

On August 27, 2019, Burkins saw NP Aryiku and informed her that he had not received any follow up treatment after his fibroscan in May. *Id.* at 49. NP Aryiku requested a consult with the Panel. *Id.* at 53. A determination regarding Burkins's HCV treatment had not been made when he inquired again during a sick call on September 20, 2019. *Id.* at 51. Pursuant to the Panel's direction, on October 12, 2019, a Hepatitis B vaccine and a PT/INR test, to monitor Burkins's liver function, were ordered. *Id.* at 66; *see* ECF No. 29-1 at ¶ 6. At a sick call on October 21, 2019, Burkins requested HCV treatment and was referred to his chronic care provider. ECF No. 24-6 at 71-72. Burkins received Hepatitis B vaccination shots on October 29 and November 29, 2019. *Id.* at 74-75.

Burkins was seen in chronic care by NP Adegorusi on December 16, 2019, at which time the Panel still had not made any further determinations regarding Burkins's HCV treatment. *Id.* at 81. Burkins denied any difficulties with his bowel or bladder and NP Adegorusi noted that his viral load and liver function were to be monitored after treatment was completed. *Id.* On January 4, 2020, NP Adegorusi ordered laboratory testing requested by the Panel. *Id.* at 87-88. In light of Burkins's low viral count, on January 27, 2020, the Panel recommended that a viral load test be repeated in three months and then the case would be reviewed again. *Id.* at 94. Dr. Atnafu noted that Burkins's viral load had decreased from 15,000 to 3,090 and had a Fibroscore of F0-F1. *Id.* at 95; ECF No. 29-1 at ¶ 19. NP Adegorusi ordered laboratory testing and a Hepatitis A vaccination on the Panel's recommendation. ECF No. 24-6 at 96; ECF No. 24-7 at 1. Dr. Atnafu attests that the Panel recommended monitoring Burkins's condition because his decreased viral load indicated that his HCV may resolve without treatment. ECF No. 29-1 at ¶ 19.

On February 8, 2020, Burkins received a Hepatitis A vaccine.  ECF No. 24-7 at 6-7. Thereafter, due to the COVID-19 pandemic HCV treatment reviews by the Panel were suspended between April and August 2020.  ECF No. 29-1 at ¶ 21.  During that time, Burkins's viral load increased to 10,500.  ECF No. 24-7 at 27.  Burkins visited NP Aryiku on June 10, 2020, and it was noted that HCV RNA testing would be ordered following completion of his vaccinations.  *Id.* at 14.  On July 11, 2020, NP Adegorusi saw Burkins in chronic care and ordered a consult from the Panel.  *Id.* at 17.  Burkins received another Hepatitis A vaccination on July 28, 2020.  *Id.* at 24.

Burkins's laboratory results indicated that his PT/INR results were within normal limits on July 15, 2020, and his viral load was 12,600 on June 10, 2020.  ECF No. 24-8 at 72, 74.  On August 15, 2020, during a follow up appointment, NP Adegorusi noted that she contacted the Panel to follow up on Burkins's treatment plan.  ECF No. 24-7 at 32.  Dr. Atnafu attests that he does not know why Burkins was not referred to the Panel for further consultation, but states that there was a backlog due to the COVID-19 pandemic.  ECF No. 29-1 at ¶ 28.

Burkins was not seen in chronic care again until December 3, 2020, where Dr. Robert Williams noted that his viral load was 12,600 in June 2020 and his liver function tests from December 2019 "were essentially normal."  ECF No. 24-8 at 18.  Burkins expressed his concern that he would not be able to complete treatment prior to his release date.  *Id.*  The Department of Public Safety and Correctional Services mandates that DAA treatment should not be started if an inmate is scheduled for release within six months of treatment to ensure that there is sufficient time to complete a DAA treatment course.  ECF No. 29-1 at ¶ 29.  Burkins was released from JCI on March 5, 2021.  ECF No. 24-8 at 77.

II.     **Neck and Shoulder Injuries**

Burkins asserts that on November 9, 2020, he slipped and fell on an unmarked wet floor at JCI.  ECF No. 4 at 2.  Burkins was seen by NP Aryiku immediately after the fall; he reported that he could not move his head, neck, shoulders, arms, or legs. ECF No. 24-7 at 40.  An x-ray showed no neck or shoulder fractures.  *Id.*   Regardless, NP Aryiku had Burkins transported to the emergency room for further evaluation.  Aryiku Decl., ECF No 24-10 at ¶ 7.  Burkins received extensive diagnostic testing, including x-rays of his chest, pelvis, and cervical spine; CTs of his head and brain, chest, abdomen, pelvis, cervical spine, thoracic and lumbar spine; and MRIs of his cervical, thoracic, and lumbar spine.  *Id.* at ¶ 8; ECF No. 24-7 at 59-65, 84.

Upon Burkins's return to JCI on November 10, 2020, he saw NP Bernard Alenda; Burkins reported tingling in his right leg although he was able to walk.  ECF No. 24-7 at 43.  Alenda prescribed 500 mg Robaxin, a muscle relaxer.  *Id.*; ECF No. 24-10 at ¶ 9.

On November 11, 2020, Burkins saw RN Nwabuwa for complaints of extreme back and hip pain.  ECF No. 24-7 at 45; Nwabuwa Decl., ECF No. 24-9 at ¶ 6.  Burkins reported that he had not received the Robaxin prescribed; Nwabuwa informed the pharmacy, gave Burkins one tablet, and referred Burkins to a provider for a follow up.  ECF No. 24-9 at ¶ 6.  NP Alenda issued Burkins paperwork for a bottom bunk assignment for the following six months.  ECF No. 24-7 at 46; ECF No. 4-1 at 1.

During a follow up appointment on November 16, 2020, Burkins reported to NP Aryiku that he was experiencing severe pain and numbness in his legs; Aryiku prescribed him 10 mg of Baclofen.  ECF No. 4-1 at 1; ECF No. 24-7 at 47-48.  Burkins sat in a wheelchair but was able to walk and did not exhibit any distress or visible injuries.  ECF No. 24-7 at 47.

Burkins returned to medical on November 23, 2020 and saw RN Nwabuwa; he reported severe neck pain and that the Baclofen was not relieving his pain.  ECF No. 4-1 at 1; ECF No. 24-7 at 49.  Nwabuwa spoke to NP Aryiku, who prescribed ibuprofen.  ECF No. 24-10 at ¶ 12; ECF No. 24-9 at ¶ 7.  Burkins asserts that his medication was not changed and Nwabuwa dismissed him.  ECF No. 4-1 at 1.

Burkins saw Nwabuwa again on November 30, 2020, for the persisting pain in his neck; he asserts that he was dismissed again without any change to his medication after Nwabuwa consulted with Aryiku.  *Id.*  Nwabuwa referred Burkins to a provider for evaluation.  ECF No. 24-7 at 53.

On December 1, 2020, Burkins saw NP Alenda for neck pain radiating into his right shoulder.  ECF No. 4-1 at 1; ECF No. 24-8 at 16.  Burkins was able to walk steadily and had normal range of motion in his right shoulder.  ECF No. 24-8 at 16.  Alenda referred Burkins to a physician for further evaluation and ordered the CT and MRI results from the hospital visit.  *Id.*; ECF No. 4-1 at 1.

Burkins claims that he was seen by Dr. Williams for his neck injury and pain, but his MRI and CT results were not yet available.  ECF No. 4-1 at 2.  Burkins states he informed Dr. Williams that hospital staff said his tests were normal.  *Id.*  Dr. Williams allegedly advised Burkins that, if his tests were normal, he had a bruised spinal column, which may take two months to two years to heal.  *Id.*  Burkins asserts, however, that Dr. Williams's report only noted that Burkins had some discomfort and tenderness at the base of the cervical spine.  *Id.*  Burkins claims this is an attempt to hide a serious medical condition.  *Id.*  Additionally, according to Burkins, Dr. Williams did not order any follow up appointment even though he told Burkins he would see him again in a week. *Id.* at 3.  Burkins asserts he submitted a sick call, but was never seen again for his neck injury.  *Id.*

6

Burkins's records show that Dr. Williams saw Burkins on December 3, 2020, for a chronic care visit at which Burkins complained of neck and lower back discomfort.  ECF No. 24-8 at 18. Burkins complained of tenderness at the base of the cervical spine, but no other musculoskeletal abnormalities.  Williams Decl., ECF No. 24-4 at ¶ 7.  Dr. Williams ordered a Lidocaine patch for Burkins's pain in addition to the ibuprofen and Baclofen prescriptions.  *Id.*  Based on his evaluation, Dr. Williams believed Burkins had a minor muscle strain.  *Id.*  Burkins did not make any complaint regarding pain related to the fall during a subsequent sick call with Nwabuwa on December 9, 2020.  *See* ECF No. 24-8 at 22.

According to Burkins, on December 12, 2020, he rolled over in his sleep and fell from his top bunk and landed on his head and shoulder, knocking him unconscious.  ECF No. 4-1 at 6. Burkins states that he woke up in extreme pain in his right shoulder and lower back.  *Id.*  Burkins asserts that Dr. Williams prescribed ibuprofen and told Burkins to return to medical if the pain worsened.  *Id.*  However, the medical records show that Burkins was transported to the medical department in a wheelchair and was seen by RN Mercy Addai.  ECF No. 24-8 at 24.  Correctional staff reported that Burkins was found on the floor initially unresponsive but was arousable on verbal command and had initially slurred speech.  *Id.*  Burkins vomited and RN Addai suspected that he was intoxicated; he remained under observation overnight.  *Id.*  On December 13, 2020, he reported to RN Evelyn Nulah that he had been intoxicated and returned to his housing unit.  *Id.* at 25.  Burkins returned to medical later that day complaining of pain in his right shoulder and lower back; both were swollen and tender.  *Id.* at 27.  RN Nulah notified Dr. Williams, who ordered ibuprofen and directed Burkins to return if the pain worsened.  *Id.*

On December 14, 2020, RN Nwabuwa saw Burkins for pain in his right shoulder and right hip.  *Id.* at 30.  Burkins exhibited difficulty moving his shoulder and slight swelling around his

clavicle. *Id.* Nwabuwa referred Burkins to a provider for further evaluation. *Id.* Burkins was examined by NP Aryiku; a sling and x-ray were ordered for Burkins's right shoulder. *Id.* at 33; ECF No. 24-10 at ¶ 21. Aryiku attests that Burkins reported to Nwabuwa that he took his ibuprofen but did not report taking Baclofen or using his Lidocaine patch. ECF No. 24-10 at ¶ 21. Aryiku avers that she believed the Baclofen and Lidocaine patch, together with the ibuprofen, was appropriate to treat Burkins's pain. *Id.* The x-ray revealed no acute fracture but a subtle Hill-Sachs deformity. ECF No. 24-8 at 32. Burkins did not make any musculoskeletal complaints during a subsequent sick call for a COVID-19 test. *Id.* at 35. Burkins returned to medical on December 18, 2020, to review his x-ray results with NP Electa Awanga. *Id.* at 39; ECF No. 4-1 at 6.

Burkins returned to medical on December 21, 2020, due to a positive COVID-19 test result, and states that he tried to discuss his neck injury with Dr. Williams. ECF No. 4-1 at 2. Dr. Williams allegedly repeated that Burkins had a bruised spinal column, but still had not seen Burkins's test results. *Id.* Dr. Williams renewed Burkins's prescription for a Lidocaine patch and he was moved to an isolation unit that same day due to a positive COVID-19 test. ECF No. 24-8 at 41, 43, 45. Dr. Williams avers that examination of Burkins's right shoulder revealed that he had full range of motion and the acromioclavicular ("AC") joint was not tender. ECF No. 24-4 at ¶ 10. Burkins did not state that he had any spinal tenderness, although Dr. Williams observed bruising on his right lower back. *Id.* Dr. Williams told Burkins that they needed to address his COVID-19 infection before any nonemergent shoulder complaints. *Id.* However, Dr. Williams did not see Burkins after December 21, 2020. *Id.* at ¶ 11.

While in isolation, Burkins reported pain in his right shoulder to various providers. ECF No. 24-8 at 49, 51. Dr. Amit Kalaria recommended another x-ray for Burkins's shoulder injury

once he was discharged, and Dr. Faulin Paletsky suggested another MRI if the injury was still problematic weeks later.  *Id.* at 51-52, 53-54; ECF No. 4-1 at 6.  Burkins was discharged from isolation on December 25, 2020.  ECF No. 24-8 at 55.

On January 4, 2021, Burkins saw NP Aryiku and asserts that he informed her that he still had severe neck and back pain as well as a new injury from falling off his top bunk in his sleep. ECF No. 4-1 at 3.  Aryiku ordered an orthopedic assessment of Burkins's shoulder.  ECF No. 24-8 at 58.  Burkins alleges that he asked her to make a note for them to assess his neck and back as well, but that Aryiku responded, "no that's to [sic] much."  ECF No. 4-1 at 3-4.  The following day, Burkins saw Dr. Lawrence Manning for his orthopedic consult; Dr. Manning assessed his right shoulder and Burkins requested that he assess his neck as well.  *Id.* at 4; ECF No. 24-8 at 60. Dr. Manning concluded Burkins had an AC joint separation in his right shoulder, a cervical sprain, and mild right upper extremity radicular symptoms.  ECF No. 24-8 at 60.  Dr. Manning ordered weightbearing films of Burkins's shoulders, physical therapy, and muscle relaxant Robaxin.  *Id.* Burkins asserts that Dr. Manning did not have access to his CT or MRI results.  ECF No. 4-1 at 4. Burkins asserts this was a failure of Scheduler Mable Fletcher, who did not obtain a full medical report from the hospital as ordered by NP Alenda on December 1, 2020.  *Id.*

Burkins inquired about scheduling his diagnostic tests at a sick call on January 20, 2021. ECF No. 24-8 at 62.  He returned on February 2, 2021, complaining of severe shoulder pain radiating into his right arm and tingling in his fingertips.  *Id.* at 64.  Burkins reported to NP Alenda that he had not received his Robaxin prescription.  *Id.*  Alenda ordered the Robaxin.  *Id.*

Burkins asserts that he was supposed to see Dr. Manning for a follow up appointment after his x-ray, which was not completed until February 3, 2021, nearly a month after it was ordered. ECF No. 4-1 at 4.  The x-rays indicated a right AC separation with mild superior displacement of

9

lateral end of right clavicle.  ECF No. 24-8 at 95.  An appointment with Dr. Manning was requested

during a sick call on February 9, 2021.  *Id.* at 66.  Burkins was released on March 5, 2021.  *Id.* at

77.  Since release, Burkins asserts he has undergone physical therapy and surgery for the right AC

separation.  Reply, ECF No. 28-1 at 2, 5.

### Standard of Review

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil

Procedure 12(b)(6), the factual allegations of a complaint "must be enough to raise a right to relief

above the speculative level on the assumption that all the allegations in the complaint are true

(even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations

omitted).  "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the

elements of the claim.  However, the complaint must allege sufficient facts to establish those

elements."  *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).

Rule 56(a) provides that summary judgment should be granted "if the movant shows that

there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a) (emphases added).  "A dispute is genuine if 'a reasonable

jury could return a verdict for the nonmoving party.'"  *Libertarian Party of Va. v. Judd*, 718 F.3d

308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir.

2012)).  "A fact is material if it 'might affect the outcome of the suit under the governing law.'"

*Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Accordingly, "the mere

existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment[.]"  *Anderson*, 477 U.S. at 247-48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party, *Tolan v.

Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam) (citation and quotation omitted), and draw all

reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. NC. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

Defendants' Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56(a). A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible where a plaintiff has "actual notice" that the motion may be disposed of as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260-61 (4th Cir. 1998). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for a court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; a court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261. Because Defendants filed a motion styled as a motion to dismiss, or in the alternative, for summary judgment, Burkins was on notice that the Court could treat the Motion as one for summary judgment and rule on that basis.

## Discussion

### I.      Respondeat Superior

Corizon Health Inc. ("Corizon") asserts that it is entitled to summary judgment as Burkins fails to allege that any policy, practice, or custom led to a violation of his Eighth Amendment rights and solely claims that Corizon is liable due to the acts of their employees. ECF No. 24-2 at 23.

11

The doctrine of respondeat superior does not apply to claims asserting constitutional deprivations brought pursuant to 42 U.S.C. § 1983.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983).  As in this case, a private corporation that steps into the shoes of a state actor cannot be held liable for a § 1983 claim solely upon a theory of respondeat superior.  *See Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Maryland Dep't of Pub. Safety and Corr. Servs.,* 316 Fed. Appx. 279, 282 (4th Cir. 2009).  Instead, liability to a private entity attaches only when a constitutional deprivation results from the entity having implemented an unconstitutional policy, custom, or practice.  *See Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978).  Therefore, to proceed, Burkins must identify some evidence that he was denied medical treatment pursuant to a policy, custom, or practice and it proximately caused a violation of his constitutional rights.  *Monell*, 436 U.S. at 690; *see also Jordan ex rel Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

Burkins presents no evidence to support a claim such as this.  Rather, he does not pursue this liability at all, and therefore, summary judgment is granted in Corizon's favor on this basis alone.

## II.    Deliberate Indifference

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal

judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017).

To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-7 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need). Proof of an objectively serious medical condition, however, does not end the inquiry.

After a serious medical need is established, a successful claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition.

*See Farmer*, 511 U.S. at 839-40.  "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'"  *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).  The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

a.  <u>HCV Treatment</u>

Burkins's allegations regarding his HCV treatment generally assert that his treatment was delayed while he was incarcerated at JCI and that Dr. Williams participated in delaying his treatment until he was released from custody.  Viewing the evidence in the light most favorable to Burkins, the Court cannot find that Williams was deliberately indifferent to Burkins's need for HCV treatment.  Importantly, based on the undisputed evidence, it was not within Dr. Williams's purview to determine whether Burkins received DAA treatment; rather, the Panel was responsible for making such a determination.  Burkins's medical records show that his liver function was monitored throughout his incarceration.  While Burkins may disagree with Dr. Williams's actions at a singular chronic care visit in light of his impending release date or with the Panel's decisions regarding his HCV treatment, neither demonstrates a constitutional violation.  "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged."  *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)).  Burkins does not present any evidence of exceptional circumstances; moreover, there is no evidence that the alleged delay in treatment exposed him to a serious or significant injury.

*See Brown v. Comm'r of Cecil Cty. Jail*, 501 F. Supp. 1124, 1126 (D. Md. 1980) (delay "does not violate the Eighth Amendment where the seriousness of the injury is not apparent"). Burkins's liver function was indeed monitored throughout his incarceration and he was administered various tests and vaccinations pursuant to the Panel's direction. As such, Dr. Williams is entitled to summary judgment on this claim.

b. <u>Shoulder and Neck Injuries</u>

Burkins alleges that Defendants Aryiku, Nwabuwa, and Williams ignored his ongoing pain following his fall on November 9, 2020, and that Defendant Fletcher participated in their deliberate indifference by failing to timely obtain his medical records from the hospital. The undisputed evidence before the Court establishes that Burkins received constitutionally adequate medical care. Aryiku, Nwabuwa, and Williams's affidavits, along with Burkins's medical records, demonstrate that his complaints of pain were not ignored as he alleges. Following his initial fall, Aryiku assessed Burkins and ordered x-rays which did not reveal any fractures. Regardless, Aryiku sent Burkins to the emergency room for further evaluation out of caution. Upon his return, Nwabuwa ensured that he received his Robaxin prescription and referred him to a provider to obtain bottom bunk paperwork. When Burkins reported that Robaxin had not been effective in treating his pain, Aryiku changed his medication to Baclofen. Nwabuwa ensured that the Baclofen was supplemented with ibuprofen when Burkins reported that the pain persisted. Burkins was referred to Dr. Williams who assessed Burkins and based on that evaluation determined that he had a muscle strain and prescribed a Lidocaine patch to relieve the pain.

The medical records further establish that following Burkins's fall from his bunk, his shoulder was once again assessed by Dr. Williams, who determined that it had resulted in swelling and tenderness and prescribed Burkins ibuprofen and directed him to return if the pain persisted.

Burkins returned to see Nwabuwa and reported difficulty moving his shoulder prompting Aryiku to order another x-ray and providing Burkins with a sling for his right arm. Aryiku believed that the combination of Baclofen, ibuprofen, and a Lidocaine patch was sufficient to treat Burkins's pain. At Dr. Williams's final appointment with Burkins he did not find any AC joint tenderness and Burkins presented with full range of motion. Therefore, Dr. Williams only renewed Burkins's Lidocaine patch. However, as Burkins continued to report pain, Aryiku ordered an orthopedic specialist assessment. Dr. Manning ordered several tests and diagnosed Burkins with a right AC joint separation only a month prior to his release from JCI. While Burkins asserts that Scheduler Mable Fletcher failed to timely obtain his prior medical records from the hospital for Dr. Manning, she is not responsible for obtaining such records. Fletcher Decl., ECF No. 24-11 at ¶ 4.

Viewing the evidence in the light most favorable to Burkins, the Court cannot find that Defendants Aryiku, Nwabuwa, Williams, or Fletcher were deliberately indifferent to his pain or injuries. Especially as to Nwabuwa, for whom Burkins admits the only fault he finds is that she was the communicator between himself and Aryiku. ECF No. 4-1 at 5. Defendants Aryiku, Nwabuwa, and Williams continually evaluated Burkins's condition and ordered additional tests and specialty consultation in response to Burkins's complaints of pain and immobility. None of these Defendants' decisions regarding Burkins's care amounted to an act or omission "for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. Moreover, there is no evidence that Defendant Fletcher was aware of Burkins's medical condition nor that she disregarded his need for care by failing to obtain off-site records, as she is not responsible for doing so.

As Defendants and other medical providers gave regular attention to Burkins's medical condition, the Court concludes that the record, even viewed in the light most favorable to Burkins,

16

does not support a finding that they acted with deliberate indifference.  Burkins has not shown that Defendants exhibited a callous disregard for his serious medical needs, even though his condition could not be resolved prior to his release.  *See Estelle*, 429 U.S. at 105-06.  Accordingly, the Court finds that there is no genuine issue of material facts at issue and Defendants are entitled to summary judgment in their favor.

### Conclusion

Defendants' Motion, construed as a motion for summary judgment, is granted.  Judgment is entered in favor of Defendants.  A separate Order follows.


January 20, 2022                                                           /s/
Date                                                         Stephanie A. Gallagher
                                                             United States District Judge